All right, we call the third case of the day, Cameron International v. Liberty, Mr. Auslander, is that correct? Thank you, Your Honor. May it please the Court, my name is Mitchell Auslander and I'm counsel for Appellant and Cross-Appellee Cameron International. Cameron appeals from a judgment of the District Court for the Eastern District of Louisiana, which dismissed on summary judgment Cameron's claim under Chapter 541 of the Texas Insurance Code and denied Cameron's motion for attorney's fees under Texas Civil Practice and Remedies Code Section 38. Liberty appeals from the District Court's judgment awarding Cameron damages for breach of contract. I propose to begin with the Chapter 541 issue because we think that that presents a very serious issue under the Erie Doctrine. In his decision granting Liberty summary judgment on Cameron's claim for unfair claims practices, Judge Barbier agreed with Cameron that Texas law, as set forth by the Texas Supreme Court in bail against Texas Farm Bureau Mutual, does not require a policyholder to show that it suffered damages in addition to wrongfully denied policy benefits, as the wrongfully denied policy benefits were the actual damages in the bail case, so held the Supreme Court. However, Judge Barbier said he was compelled to follow this Court's decision in Great American, which included, Your Honor, you know about it, okay, and Chief Judge Stewart, because of the footnote, which indicated that independent injury would be necessary, and that was a case where there had been wrongfully denied policy benefits. Recently, Judge Ellison, in the Southern District of Texas, also reached the same conclusion as Judge Barbier, indicating that there are some questions as to the state of Texas law or the law on the subject now, but he, too, was compelled by this Court's decision in Great American to find that independent injury was necessary. Do you believe that they are compelled? Do you believe that that's an actual holding of the case, or is it possible to read that as not necessary to the outcome of the case, and so that it could be seen as dicta, and therefore not binding on us? Yes, Judge Elrod, you're speaking about Great American itself, and we believe that the footnote that they both relied on is dicta in that case, because the case was remanded for consideration as to whether there was independent injury. Great American did not itself hold that independent injury would be required in a situation where there was a denial of policy benefits. That was a pretty strong inference. It was a very strong inference, but it was not— How do we get around it? Well, because it wasn't actually the holding. The footnote itself— I have to remand if that wasn't the holding, if it was dicta. The court assumed, with all due respect, it appears that the court assumed that the rule of the case was governed by the Parkins decision, which was a case where there was no wrongfully denied policy benefit. So, of course, in that instance, it would be necessary to find some independent injury. But, Judge Clement, in terms of the answer to your question, I think the law of the circuit is that if statements by the court can be excised completely without changing the outcome of the case, the outcome of the case was to remand it back to the district court, then that is dicta. Also, if there is— We don't have any case thus far in Texas or otherwise that has said that's dicta. That's correct. No court has said that. I know it is. I'm just saying, you know, there's footnotes and there's footnotes. I mean, it's the argument, but I'm just saying. I don't claim to have read every Texas case or every case in this whole line, but I sure have looked to see whether some case said that that's dicta. So, I'm not saying don't make your argument. I'm just saying lots of people had five years to say what it is, and nobody has held or uttered that I know of, but I don't even claim to be close to have read everything that there is on dicta. So, I mean, it's been there, right? Well, Your Honor, no court has specifically said that it is dicta, but there have been Texas appellate courts that have said that VAIL still supplies the rule of law. Well, it wouldn't be binding on them anyway, so that's kind of almost irrelevant what they're saying about what we said because they don't have to even read what we say in that way if they can go straight to the source. Well, some of the Texas appellate courts do cite some of the federal courts. Well, I know they do because sometimes they think we have some guidance to offer, but they don't technically have to look at what we've said on the subject if they believe the Texas Supreme Court has spoken. But my question is, what is the case that you were citing for the proposition of what the definition of dicta is in our circuit? I don't have that handy, Your Honor, and I apologize for that. Because that would seem very important because none of the courts that have said it's not dicta have actually gone through the analysis of what dicta is in our circuit, to my knowledge. Have they? No. But the dicta, as I understand the law in the circuit, is where the statement that is the dicta or the alleged dicta or purported dicta can be excised out of the case and where the circumstance is where there was an unexamined assumption that the court may have made. And that comes from a case in the United States Supreme Court called Brecht v. Abramson, 507 U.S. 619, 631, 1993. That unexamined assumptions, which is, I think, what we may have here, are not holdings of the case. But if it was dicta, there would have been no remand because the loss would have been the policy benefits that were not paid. So I don't... It would not have been... It's sort of weird not to be trying to justify the case since I was on the panel, but I don't see how it's not dicta. I think, Judge, it's absolutely fair to say, with all respect, that the court assumed that Parkins controlled the decision in the case where there were policy benefits. But the court did not cite veil, which was certainly the controlling decision under Texas law in circumstances where there were wrongfully denied policy benefits. But would there have been a remand if it was merely dicta? That's the question Judge Clement is asking. It would not have had to be remanded because there wouldn't have been any reason to determine whether there was separate damage. So then... It wouldn't have changed the outcome of the case. It would not have changed the outcome of the case. So assume now that it is not dicta. What do we do? If it's not dicta, I think the court has two options. One is that it can certify the case to the Texas Supreme Court for clarification. And that is an odd result here because the Texas Supreme Court, in our view, has already spoken to the issue in veil. So that's sort of mindless. That would be sort of embarrassing, right? It might be. It might be. What's the second choice? The second choice is to have an en banc review of the case for the court to decide what they think the Texas law is on the subject. Well, if you say the Texas court has already decided and doesn't need it, then why do we go through an en banc process in a near case to say what the Texas law ought to be? I mean, that's just as circular. I mean, it's admittedly the acid test is what Texas says it is. Everybody agrees on that. So to go around the bush with en banc with 17 people to say what we think Texas law is, which, A, no matter what we say, everybody agrees, Texas could ignore anyhow. So that doesn't seem to get it. What am I missing? Texas Supreme Court has had, you say they have, five years' worth of these cases flown through. They're not cherry about commenting on our cases, whether it's relevant or not, but particularly sending signals. So there may be some difference of opinion about what the courts may say, particularly when we're talking about the Texas law. So can you say purely and simply that, you know, the Texas Supreme Court is so clearly opined that any further iteration by them would be pointless? Well, I think, Your Honor, we have an eerie crisis here. I don't think the circuit can go forward with one rule of law while the Texas state courts go forward with another rule of law. And that's exactly the situation we have here, and Judge Barbier saw it, and Judge Ellison has now seen it. But I think the en banc- I'm sorry, Judge. Just finish your answer. I'm sorry. I think the en banc route is something that is available. In Federated Mutual Insurance Against Grapevine, Excavation, 197 Fed 3rd 720 at page 729, 1999, this court indicated that certification- I'm sorry, this goes more to the certification point. Because certification is the only way we're going to get the Texas Supreme Court to say, you know, we think Vail was overruled by subsequent case law, or Vail remains the law. But this court said certification is the most principled solution where this court, that is the Fifth Circuit, and the Texas state courts disagree as to the effect of disputed language in a Texas Supreme Court opinion. How many have we certified out of this now? Two. Have we sent two matters to be certified already in this case? You wouldn't know. You don't know. I didn't work on it, but the answer is yes. You have sent two cases. But this one, they're all different, Judge Elrod. But this one really has nothing to do with- Yeah, I've been on some of the other ones. Yes, this is different. This is the insurance-interesting Texas issue. Well, but this is the one where we have two rules of law that apply, and I don't think that we can continue on that way. Is there a third option? Well, I went through my three options. DICTA, certification to the Texas Supreme Court, or en banc. I didn't realize DICTA was- All right, what about this? I don't know the answer because this rarely happens where we admit we made a mistake of law. But the panel was Garwood, Stewart, and Clement. Yes. All right, so is there an option? Judge Garwood, of course, we know has passed away, and we can blame this on him because he was the Texas lawyer. Is there an option whereby if the parties would agree, we could withdraw the mandate in the Great American case? And reissue an opinion which is consistent with the Texas law that should have been applicable. Yes, you could, and I wish I had thought- I don't know if there's any authority for that, so you'll have to look at it. I haven't seen it. We've looked at the law as a circuit. We've looked at it every which way we could, and we've come up with those three. We haven't seen authority for that. I can throw you a hint that there's a gigantic obstacle to that occurring. It's called a court. It's called agreement. Yes, it's called one of the panel members. If you get my drift. Yes. Yes. It's a sensitive issue on our court, withholding, withdrawing mandates, but I thought it would be- Are you going to talk about your attorney's fees? Yes. Because it seems like that under Amerishore that the court erred in saying that they had to have been already briefed. Yes, my time is running short, so I will be brief on that, but the court did err. We fully appreciate that Judge Barbier had his hands full. Hang on a minute. Madam Clerk, give counsel three more minutes on the clock to deal with the attorney's fees. If the other side needs more, I'll give you three. We're here. Lots going on in this case, so give them three. Now, you got it? All right, now, so you're unimpeded to give us the full board. Thank you, Judge. Judge Barbier did err. He was extremely busy, no question, as he says in his opinion, with the Deepwater Horizon MDL and indicated in his opinion that he was not inclined to deal with our attorney's fees issue, but there has never been a case that we have been able to find where a party has been deemed to have waived its statutory right to attorney's fees under Section 38 by not moving to get those attorney's fees before it actually won the breach of contract case. And if we have a published case that says it's premature to even ask for them, then that would seem to cut against that, wouldn't it? Yes. I think that this is just a clear error on his part, understandably because of what he was dealing with, but if we had moved, to Your Honor's point, if we had moved for attorney's fees before we actually won the summary judgment motion, I think he would be telling us respectfully that he is very busy. Don't bring me your attorney's fees case, your attorney's fees motion, your attorney's fees issue under Section 38 until you have won a breach of contract case. You couldn't have even quantified it at that point. Correct. Correct. So I think on that one there is a plainly clear error. As long as I have time, I'd like to move to a liberties cross-appeal, and I'd like to deal with that now and on reply. As far as the other insurance provision is concerned, which is one of the two defenses that Liberty relied on, Judge Barbier actually went through in detail Liberty's position on the interpretation of that and concluded that it was unreasonable. Originally, on a motion for judgment on the pleadings, he said that there are two competing interpretations, and under the contra preferentum doctrine, Cameron was entitled to win. That was on a motion for judgment on the pleadings at the beginning. After he had the entire record in front of him following discovery, he concluded that it is also an unreasonable interpretation. And it is. And the basic reason why it's unreasonable is because in an other insurance situation, and assuming even that Liberty's, I'm sorry, Transocean's indemnity was insurance, leaving that aside for a moment, it's never up to the policyholder, in this case Cameron, to fight with the two competing other insurers over who ought to be paying. The policyholder is supposed to be paid, and then the other insurers, in this case Liberty and then Transocean, have to decide how they're going to allocate the loss as between them. Liberty's position in this case stands that completely on its head and left Cameron in a terrible position right at the moment where it needed to settle the BP litigation or run the risk of disastrous results. That is not what the law is. That is basically, that's basic unfairness. And with respect, we don't think that Liberty has answered that point. They do argue, switching back to, if this court decides that their position has some reasonableness to it and the language is somehow ambiguous, that we still should not win based upon the contra preferentum doctrine because there is a sophisticated, insured exception to contra preferentum. As the Parade Court said, with Judge Elrod participating on that one, the Texas Supreme Court has never said that there's a sophisticated, insured exception. And further, the court went on to talk about how if there was a sophisticated, insured exception, it would never apply in a situation where the policyholder had no involvement in the drafting of the policy. In this case, Liberty has actually conceded at its reply brief on page 16 that it, and this is a quote, Liberty conceded that Cameron did not draft the insurance contract at issue. And that had to be conceded because there are several places in the record which are entirely clear that there was no negotiation of the contract. And for that, we reluctantly— Mr. Ossendorf, I won't stop you there. I gave you additional time. You've kind of got to read. You've reserved time for your rebuttal. Thank you, Your Honor. You can either pick back up there if you want to or something else. Thank you, Your Honor. All right. Ms. Martin for Liberty. May it please the Court, in the brief time that I have, I wanted to initially begin by outlining the three key points I'd like to cover in addition to responding to some questions from the Court on the other issues that Cameron raised. First, indemnities were the policy attachment point in a condition of coverage under the LIU policy. Cameron's flip-flop on the viability of these indemnities when settling with BP prevented LIU from preserving those indemnities and now precludes coverage. Second, independently, the word applies is not unique to the other insurance clause in the LIU policy. In fact, it's ubiquitous in all types of insurance contracts. And as a result, Judge Barbier's finding of ambiguity will lead to catastrophic and absurd results given the frequency of the word applies in virtually every insurance policy in the Western world. Third, Cameron admits it released its own indemnity rights. As a result, there were no subrogation shoes for LIU to stand in  With respect to the first point, it is critical to realize that Judge Barbier's interpretation writes the word indemnification out of the policy. That concept was key to even the issuance of this policy. Without indemnifications, the record is clear there would be no such coverage. The insurance attaches, its attachment point is following the existence and the application of these indemnities. Cameron for almost two years argued the indemnities were valid, told the Securities and Exchange Commission they were valid, filed a motion for summary judgment they were valid, told the world in its 10K filings they were valid. Then on the eve of its settlement with BP, suddenly withdrew its motion, denied they were valid, and then assigned any such rights to Cameron and agreed to cooperate with it going forward if anybody argued the indemnities. Why can't they do that? Excuse me? Why couldn't they make that assignment? They certainly could make that assignment. The facts have changed. You're no longer defending a case. You're settling a case. Sure. No problems whatsoever with that business decision. The problem was the second step to say that because it had assigned its rights to indemnification, it had agreed to cooperate with BP opposing indemnification, agreed to indemnify BP if anybody succeeded indemnification, it essentially became hostile and left empty shoes for LIU to stand in if it ever tried to pursue those rights. So it certainly has that business right to do that, but it lacks the right to bargain away and negotiate away LIU's subrogation rights to go pursue that. Judge Barbier's treatment of this, though,  it attaches solely based on the underlying insurance, completely ignoring the indemnification clause in the policy. This court and the Texas Supreme Court have held for over four decades that every term in an insurance policy needs to be given its plain, ordinary, common, understood meaning. Judge Barbier just simply writes it out of the policy. But then he takes a second step, which I made in my second point, and he deals with the term applies, and he finds the word applies to be ambiguous. It's significant that no court in the country has held the word applies to be ambiguous. Second, it is significant that here the word applies exists 27 times in this very insurance policy, and any search of Google or Westlaw or anything else would show it exists in virtually every insurance policy in the Western world. Okay. If we find that applies could be ambiguous, you can't win on this because of the theory that the insurer gets the benefit of the doubt under Texas law and then also because there's no sophisticated insurer, right? Well, two points, Your Honor. Number one, I would argue that there's not a second reasonable interpretation. In other words, for applies and indemnification to be ambiguous, you've got to find a second reasonable interpretation. I would argue it's not there because if you apply the exact same construction to the self-insured retention component, it leads to ridiculous, absurd results. It would mean an insured with a self-insured retention could say we don't think it applies. Okay. Do you need sophisticated insurer to win on your three key points? It's a secondary argument. We think it does apply. We think your decision from last week indicates that, first of all, distinguishing facts that there they waived it. Here we did not. But second, and when you identify a strict interpretation, moderate interpretation, your panel was specifically asking for evidence of a sophisticated insured involved in the policy. We have that here in this record. This record indicates the involvement of Marsh in the negotiation of this policy for a Fortune 100 company with the biggest broker in the world. And the record shows negotiation by Marsh on behalf of Cameron. But we said if you didn't participate in the negotiations, we said what opposing counsel said we said. Sure, sure. So you're stuck with that, aren't you? Well, here the record shows that they did negotiate. And certainly I realize this panel is bound by the prior determination of the court. But we think that, for example, Judge Fitzwater's analysis even further in the Vaught Aircraft case is also highly persuasive on this issue. But we don't think you get there, Judge Elrod. We think that in this instance there is not a second reasonable interpretation. Under Judge Barbier's interpretation, if another insurance company in this tower just simply says it's not paying, under Judge Barbier's interpretation, that's ambiguous, it's not presently available, and a carrier has to drop down. That violates three decades of case law from this court and the Texas Supreme Court. Under Judge Barbier's interpretation, if an insured with a self-insured retention says I just don't want to pay it, it's not presently available, under his interpretation it's ambiguous, and because it's ambiguous, if sophisticated insured doesn't apply, then you've got to drop down in an excess insurance company's pain when it never negotiated and priced a premium to pay. It turns the insurance issues on its head. And so the indemnities or critical attachment point applies, is not ambiguous, but third and independent of anything else is the waiver of LIU's rights to go pursue subrogation. Cameron admits that it waived its indemnity rights. Its complaint against LIU in this case in six different places that we cite in the record, in the brief, indicates that they had to waive its subrogation rights in order to have a settlement agreement with Cameron. The Texas Supreme Court has made it clear if a carrier has to step into empty shoes, that is not only not a subrogation right that can be pursued, it's a breach of the contract. It's significant that Cameron, through its settlement with BP, became adverse to LIU on this indemnity question. It not only could not cooperate with LIU in the process, it was adverse to LIU if anything was going to be pursued. LIU lost the ability to pursue it because the underlying case was resolved as far as Cameron and BP were concerned with their settlement. There was nothing to intervene into. There was no separate suit or no claim that LIU could make to pursue its subrogation rights. So as a result, LIU was denied the ability to pursue what its policy clearly indicated was an attachment point under which it would have the right to have it resolved and then have its insurance apply after that. What do you do with opposing counsel's argument that your interpretation effectively renders the liberty policy illusory for blowouts? Totally false because, number one, if there are no indemnities, the policy attaches immediately. Second, Your Honor, if an indemnity exists and it's simply not valid, let's say hypothetically it fails to meet the express negligence test, then our policy attaches immediately. The third scenario is it exists and the indemnities do apply, then we simply attach on top of those indemnities. Once again, the record reflects that's the sole reason this policy was issued. It would take years to work through that last explanation. And that was Judge Barbier's concern at oral argument on the 12B motion, but it's not an issue that's foreign to the insurance world. But the benefits didn't really apply presently. The benefits certainly did apply because— They weren't paying them. Well, certainly, Your Honor. But if they had simply preserved the right for us to go pursue the subrogation, in other words, if they hadn't waived their rights as it related to us, then we would have paid. The record is clear that we had offered payment. We had attempted to settle multiple times, and the record is clear that we offered them money, but we simply wanted a recognition of the value of indemnities. If they had simply said, okay, we won't have the nonfinancial terms, you can pursue your claim, we would have paid the claim and then gone and pursued subrogation to resolve that very issue. Your position was to pay the benefits after the indemnification had been resolved. Under the flexibility of the broad wording of the clause, we had the ability to do either one. If the insured is going to pursue indemnities, then we're going to wait. If the insured says, no, we don't want to preserve the indemnities, then at least preserve our right to do so. Here, they rode the first horse, totally changed horses, and then precluded our right to get on the first horse to resolve that attachment point in the policy. When Judge Barbier says, well, this will just take time, his only resolution is rewrite the insurance policy. So the timing issue would provide $50 million in benefits if they would simply preserve our rights to go figure out indemnities. If indemnities aren't valid, then we don't have a recovery. If the indemnities are valid, then we would get a recovery. But Cameron, in paragraphs 4.3 and 4.5 of their settlement agreement with BP, destroyed our rights to do so. Can you explain one more time for me why this isn't the unconscionable situation of hardware dealers? It's not unconscionable because if the indemnities don't exist, let's say Cameron and Transocean just never signed a master service agreement with indemnities. This policy doesn't contemplate any of their tens of thousands of business contacts, some of whom have indemnities, some don't. But if they don't have an indemnity, we attach immediately, so automatically – But if they do, they shouldn't be worse off, and that's what the hardware dealer's point is. Sure, but here there's no way they're worse off because, number one, if they pursue those indemnities and they recover them, then we attach on top of it and there's $500 million towers intact. Your Honor, if they choose not to pursue those indemnities and they tell us, then we can. LIU can pursue them. So under either scenario, hardware dealer's scenario never happens because they pursue indemnities, as they did here for almost two years, and we attach at the end of the process. If the indemnities are invalid, we attach immediately. If the indemnities are valid, we attach as soon as the indemnities are finished paying. If there are no indemnities, we attach immediately, and the fourth scenario, Your Honor, is if they choose to settle and just say we're not going to pursue the indemnities, don't preclude our right to do so. We step into their shoes and pursue that, but paragraphs 4.3 and 4.5 don't give us the ability to do that. I gave the Court a handout that I hope you receive from the clerk's office because it raises one more critical issue that we've not discussed, but it's in the briefing. In the bottom right-hand corner of the handout, it identifies the loss definition, and the loss definition is critical because Judge Barbier's decision on the contract is also in error because it invalidates the loss clause. You'll notice this is important because the other insurance clause immediately to the left says other insurance applies to a loss covered by this policy, and then it continues with the self-insured language and the indemnity language. But the loss definition talks about those sums legally obligated to pay as damages. Judge Elrod, the question you raised about hardware dealers goes to this exact point because the loss clause says whatever you are legally obligated to pay as damages. Their defense, Cameron's defense to BP and Transocean was always we've got indemnities, and that goes to the heart of the loss issue. Judge Barbier just completely ignored the briefing on it and the arguments on it and has simply said, no, you attach because the indemnities aren't presently available. It ignores the loss clause. Are you going to get to the 541? Yes. Because we're very interested in that. Yes. As you can tell, we have lots of questions. We'll transition there right now. With respect to the questions the Court's raised, number one, in Great American, you clearly remanded. Okay. We remanded. But does that mean that it's not dicta? It is not dicta because this Court standard that we briefed on page 58 and 59, the U.S. Bank v. Horizon case from this Court, the International Truck v. Engine Corp. says the test for dicta v. non-dicta is, is it essential to the resolution of the case? And because we remanded, it's essential? That's your position? No, ma'am. It's one step further. It's because you remanded on that precise issue. And because you remanded on that precise issue, that's what Justice O'Connor, Judge O'Connor did in the Northern District. On remand, he had that one issue that you remanded on whether there was independent injuries. Well, then, are you familiar with the Texas Practice Insurance Guide that you are the author of? Yes. Very familiar. Why does it say to the extent that the Fifth Circuit held that an independent injury is required? If you thought that we had held that, why didn't you just say the Fifth Circuit has held in opposition? You caged it as well. If they did, then the next clause says some commentators believe the decision is incorrect in light of veil. Sure. And my co-author is a plaintiff's lawyer. The language is a reflection of a plaintiff's lawyer and an industry lawyer writing a book, but it recognizes that Parkinson Great American touched on the issue. But I think the key point to help the court here is that— So you would say it's not to the extent that you say that it explicitly did? That's my interpretation, absolutely. Okay. Have you taken the position in Texas cases, because your firm is very well known for this type of litigation, that veil is controlling on this point and that no independent injury is required? Not that I'm aware of. I'm not aware that we have. Would you have been allowed to have given Texas law? Had I been allowed? Yes. Is there anything in Texas law that would preclude you from taking the contrary position in Texas cases? Well, the problem is that Castaneda didn't overrule veil. It's out there. As a law professor, I have to teach my students that. Right. They're going to argue veil. But what is significant is the Kilgarlin court that decided veil and the Phillips court that decided Castaneda has consistently moved away from veil. But they haven't overruled it. And, in fact, recently one of your colleagues wrote a brief that said veil is the law of Texas and spoke glowingly of veil, one of the colleagues at your firm, in a Texas appeal. Okay. I'm not aware of that. Okay. But the issue is what have the Texas courts done since Castaneda? And the vast majority of the cases that we cite deal with this exact issue. On page 53, 54, and 55, we cite numerous cases that deal with the issue of coverage versus non-coverage and whether you have to have an independent injury. We cite the Gordon case from the San Antonio Court of Appeals. We cite the Laird case from the Texarkana Court of Appeals. We cite the Dimer-Chrysler case from the Houston First Court of Appeals. So you're saying the intermediate Texas courts are moving away from veil. That's the majority of them. We've got the Menchaca case from the liberal Corpus Christi Court of Appeals that now is in front of the Texas Supreme Court. That's my case. Tried it in the Montgomery County courts. It got transferred by reallocation to Corpus Christi. Do you think this is likely to solve this inquiry? I think that's one of the answers to Justice Clement a few minutes ago that there's other options here. So we could wait for that case to see if it explicitly addresses it, and then we'll have an intermediate Texas Supreme Court opinion. And so then we wouldn't have to certify this one if that case ended up addressing the issue. Correct. I don't think you need to certify because our brief was done in July in Menchaca. The plaintiff's brief is due on the 20th of this month. Our reply brief is due on the 7th of December. And this is explicitly presented and raised? It's a core issue. So you don't think they can not address it? I don't know how you sidestep it. It perfectly tees up veil, and the briefings are available on the Texas Supreme Court website. Well, as a non-Texas lawyer sitting up here, I'm not privy to the mechanics that you're alluding to. So for me, break it down and tell me precisely the case that you and Judge Elrod are having a conversation about that's teed up and exactly how the issue is articulated and framed. I heard you say it's a gut issue, but I just need to hear it said differently. Menchaca is a case raised by Cameron. It is a case where the Corpus Christi Court of Appeals, for the second time that I'm aware of in Texas jurisprudence since Castaneda, embraced veil. So in Menchaca, they said we're ignoring Castaneda. Veil was never overruled. And they did it because in that case, I convinced the jury there was no breach of contract, but they found one violation of the insurance code. So the issue is squarely teed up in front of the Court of Appeals with no breach of contract. Can you have a statutory bad faith claim? It's a primary issue before the court. We filed an application for writ of error with the Supreme Court. The court asked for a brief on the merits, a huge sign they're interested in the issue. Our brief was filed last July. There were a series of extensions. Plaintiff's brief will be filed in less than 20 days. Our brief is due the 7th of December. The issue is teed up, and we assume the Supreme Court will have oral argument in early 2016 since the briefs are totally done. So I think Justice Clement, that's another alternative. Is there any problem for either party with waiting? The other side is saying yes, so I'm sure they'll tell us on the rebuttal. We have no problem waiting because we don't think a certification will do anything other than . . . If we certified, it wouldn't probably get done quicker than ruling on this other case anyway, though, would it? Correct. It's already been briefed. But it would seem to me that what you're saying, because you brought in this intermediate courts in Texas, that you're saying that certification is a better answer than en banc because you're saying that there is some doubt or cloud on bail. And so that en banc, to say bail controls and we were wrong, if we were so inclined, and we may not be, and I'm not prejudging that, that en banc is not the right thing, that certification, because you think there's a cloud on bail itself. Sure. En banc would simply be a guess, an eerie guess as well. And I think the eerie guess is relatively easy for a host of reasons that we discussed in the brief. So I think en banc would be quicker. I think en banc would reach the ultimate same result. But clearly the Texas Supreme Court is going to decide what Texas law is, so en banc is just going to be an eerie guess. But we cite a tremendous amount of case law that has consistently followed Castaneda. But people that would want to go en banc would want to go—I mean, don't you—en banc would be if we thought that we made the wrong choice before. I clearly understand that. And I was simply dealing with the eerie issue. But if you wanted to certify to the Supreme Court, I think the better decision would be wait for Menchaca to be decided. It's not going to be settled, and the issue is squarely teed up in front of the Texas Supreme Court. But what am I missing here that, notwithstanding Great American and we're still in the eerie court, I won't claim to have read every case that's out here, but it should look like to me there's some square, uniform thought in Texas law among the Texas Court of Appeals, et cetera, et cetera, on the very point that you're making, which I presume is the reason why it's teed up as a core issue. I mean, the argument's kind of been like, well, you know, all of Texas is over here and agrees, and the Fifth Circuit over here and Great American is like out here on this island. It don't look all that clear to me, which to me sounds like the very reason why ultimately and where it should be, the Texas Supreme Court's going to domino as we say on it, and you persuasively argued, I think to me at least, that the issue is articulated in a way. You know how sometimes with the U.S. Supreme Court, cases grant cert on one issue, but when they rule, they bypass it and talk about something else and so forth. But you seem to say, well, particularly since you briefed it, it's just right there in the center of the bullseye that at a minimum it's going to be more than illuminating on this, but it's going to clear up quite a bit about this. Is that fair? That's very fair. And, you know, as a prediction, I think this Court's eerie guess in Great American and Parkins were right. You can't look at a case from the Kilgarlin Court in the late 70s in bail and say that's still the law after Castaneda. It was essentially sloppy jurisprudence when in Castaneda they didn't overrule bail, and it's been an argument for policyholders that has found a minority traction, but it's going to take the Supreme Court to clear it up. Well, when you're saying you can't look at this and say this is still good law, absolutely. In fact, we have to unless it's overruled. So we should have made a different determination at the time we decided Great American, shouldn't we have? No, Your Honor. I think you made the exact right decisions because, remember, Great Americans was premised on Parkins. Right, but it was a misunderstanding of Parkins. But Parkins was based squarely on Castaneda. Right, but Great American misunderstood Parkins applicability. I mean, even your treatise acknowledges that. Sure, I understand that. So Great American misunderstood Parkins. Okay. Right? I can agree with that. But the point is that were both cases end up based squarely on Castaneda, right, because, see, you just can't look at Great American's perception of Parkins. The key is are both of them consistent as an eerie guess on Castaneda. But we have to look at Castaneda and bail. You have to look at Castaneda, I think, as the most recent pronouncement of the Texas Supreme Court on this issue. Unless it overrules the other one, then we have to look at both of them, don't we? And you can do so. And in doing so, you can conclude that due to the unique factors of bail, that in the vast majority of other circumstances other than unique facts set in bail, that Castaneda is the case law. So they don't necessarily contradict each other. You could take bail on its facts and recognize that in that limited fact pattern, bail is still good law, but that's not an issue here. And it hasn't been an issue in any of these other cases, whether coverage is found or coverage is denied. Do you concede that if you don't win on your policy question and you don't win on the 541, that we've got to send back the attorney's fees in light of AmeriShore? I think there's a clear fact issue on the $4.4 million of attorney's fees, but I do want to comment here that the attorney's fees issue is slightly unique because it wasn't in an Article 38 claim. It wasn't a base of summary judgment. So it's not a de novo review because it came up for the first time under a Rule 59 motion. So it's an abuse of discretion standard. And there's a couple of things in the record on this that are really, really important. There was no pleading for an Article 38 claim under the Civil Practice and Remedies Code. There was no discovery disclosures that that was a claim being made. But it's not ripe yet. But it's – first of all, they moved for attorney's fees as being ripe on their 541 insurance code claims. So they already did it. They just got shut out in the first instance, and it's really a matter of – I would kind of use lachish terminology or sitting on your rights because what they did was they had a 541 claim where they made a present claim for Barbier to give them attorney's fees. He shot them down in the Rule 59 motion. They said, oh, yeah, we've got this other claim that we haven't presented. We haven't pled. We don't have discovery on it. We don't have experts on it. We haven't had a determination of reasonableness and necessities of fees. But, oh, yeah, give us more than $3 million in attorney's fees. Well, you get it automatically. I mean, 380 – the cases are legion. If pled, if presented, if your discovery disclosures, if you've got an expert. Well, shouldn't they be allowed to do that now? Not as a Rule 59 motion. There's not a legion of case. Well, can they bring one now separate and apart? Can they bring that claim separate and apart as a new case if they win in this case? Well, I don't believe so. Why not? Because it would be collateral, estoppel, or res judicata problems because they had the ability to present it. They had the ability to brief it on summary judgment. They chose not to. It was indispensable to their breach of contract claim on which they knew for certain. We have case law that says they couldn't have brought it. Sure, and I recognize the case law. I understand. But that case law is premised on a pleading, which is not here, on presentment, which is not here, on disclosure answers, which is not here, on expert witness issues, which is not here. So the case law that is bedrock, fundamental case law, doesn't exist because they could have done those things. And if they had made that claim, could have veiled themselves to that right after the fact. But here they never did so. But you said they moved on the 541 claim for attorneys. Yes, they moved for attorneys' fees in the 541. It couldn't be determined until after they won the summary judgment. They moved and essentially said because we win the contract as a matter of law, we're entitled to bad faith, and because we're entitled to statutory bad faith, we're entitled to our attorneys' fees. Wasn't it denied prematurely by Judge Barbier? Certainly not waived. Because he decided bad faith, it wasn't premature. The question is for the breach of contract that survived. Right. And as a Rule 59 motion, we believe it's not an abuse of discretion. Why can't we go ahead and certify, and then if they address the question in the other case, then they'll tell us they addressed it in the other case so that we don't wait months and months before getting the ball rolling in our case? We can, Your Honor. Isn't that the most efficient way to handle the case? Most efficient? I'd certainly say it is a way to handle the case. I don't think it's necessary because if there's not a breach of contract, you don't get bad faith. If you don't win on your offensive claim, then it's better to go ahead and certify, and then they can tell us, oh, we don't need to grant your certificate or grant it and say we're answering it in this opinion. They have a history of doing that. There's no problem in doing so, Your Honor. I just don't think it's necessary. Well, unless you've got some expertise I don't know about. I'm not too sure. Some of those aren't court determinations and not ones for a law professor, but in terms of what is possible or not. But I won't spar with you over that. I think you've given us the benefit of the legal issues that are propounded here. Some of these are policy issues and I'm not too sure that expert help is really useful. You've exhausted the time and very helpfully responded to the court's questions. That's really the point of oral argument for the lawyers to help us. Thank you on the main points and on all the court's questions. I'm going to shift back to Mr. Auslander for rebuttal. Thank you, Your Honor. Thank you, sir. I ask you to enforce the terms of their agreement and verse the district court. Thank you all. Thank you. Rebuttal. Thank you, Your Honor. First, I'd like to dispose of the attorney's fees issue, I think. First of all, Cameron did plead in its complaint attorney's fees, and that's all Cameron had to do. It did not have to say which section of the law it was relying on, and we know that because Judge Clement told us that in the Alpine case, which I can find the site to. Point one. Point two, there has been extensive discovery on attorney's fees. In what? Extensive discovery? What did you say? There's been extensive discovery on attorney's fees. Our attorney's fees in the case. That's in the can. There has been factual discovery. Documents have been produced. Experts have testified on it. That is actually teed up, and that's the basis on which we made our motion to Judge Barbier for attorney's fees. So it's not a question of redoing. But I want to go back to the Chapter 541, because I think that the questions that the court put to both counsel shed light on the basic disconnect here. The Menchaca case is not a case, as Mr. Martin just described it, where policy benefits were wrongfully denied. He happily won a jury case where he defeated the breach of contract case. So you're dealing in Menchaca with a case which is more like Castaneda, where there were no— That's a big distinction, whether they're wrongfully denied or correctly denied. That's a big distinction. There are two lines of cases with Vail and Castaneda. Correct. So you're saying it's the Castaneda line of cases, not the Vail. Why would that help us? It would not help us, is the point. And there is also a basic disconnect that comes from Castaneda, which Your Honor just pointed to. That was also a case where there was no wrongfully denied policy benefits. At page 196, quoting from the Castaneda case, 988 Southwest 2nd, 189, at page 196, the Texas Supreme Court said, Castaneda never brought and did not receive any contractual relief. The only theories of liability at issue in the trial court were extra-contractual ones. So Castaneda and all of the cases that follow it stand for the proposition, which is probably a correct one, if you don't have wrongfully denied policy benefits, you have to show that there was some other injury. That makes perfect sense. Vail, on the other hand, in its line of cases, stands for the proposition that if there are wrongfully denied benefits, that constitutes actual damages. And that's enough to go forward with the Chapter 541 claim. So while the state courts and the federal courts have not always kept the lines straight, the Texas Supreme Court has kept the lines straight. Vail governs the situation where there are policy benefits that have been wrongfully denied. There are actual damages. And Castaneda governs the case where policy benefits have not been wrongfully denied. You must show an independent injury in that circumstance. And it's a question of what is the best way to straighten that out. I did go back and find the case that I couldn't call to mind when I was up here a few minutes ago on what the Fifth Circuit has said about DICTA. And it's International Truck and Energy Corp. against Bray, 372 F3rd 717 at 721, Fifth Circuit 2004. And the test that the Fifth Circuit has laid down is that statements should be considered non-binding DICTA if they, quote, could have been deleted without seriously impairing the analytical foundations of the holding and being peripheral may not have received the full and careful consideration of the court that uttered it. Now, between that and the quote I gave you before from the United States Supreme Court about unexamined. So who other than the panel is going to know what was given thoughtful consideration, you know, in determining the case? I mean, that's a nice definition. But, you know, what comes out in the opinion is not necessarily what the panel fully considers in the court. I mean, it only takes you so far. Do you agree? I would agree. But in this instance, Your Honor, and with respect to both you and Judge Clement, that decision when Great American did not cite the Vail case. And with respect, I don't know how careful, full, careful consideration could have been given to that issue without citing the Vail case. What about this loss clause argument on their offensive claim rather than defending against DOJ? Yes. Well, what Mr. Morton didn't point out when he was quoting the loss provision of the policy is that on the last page of the policy, actually in the same provision at record site 3597, there's a provision that says when loss is payable. And what it says is coverage under this policy will not apply unless and until you or the insurer of the underlying insurance has paid or is obligated to pay full amount of such limits of liability. And then, and I see my time is running out, but when the amount of loss has been finally determined, we, meaning Liberty, will promptly pay on your behalf the amount of the loss covered under this policy. When Cameron reached the settlement agreement with BP, which it had to do in order to avoid a huge risk to it, that loss amount was determined. And it was payable, and it was payable promptly under the terms of this policy. Liberty did try to get out of that obligation. Mr. Morton is absolutely right. I'm not sure why he thinks it's in his favor to say we offered them less. Well, they offered us less in order to save the policy limits. That was not acceptable to Cameron. Thank you, Your Honor. All right. Thank you, counsel, both sides, for the briefing and argument in the case.